## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** 13cr59-RLW |
| | : | |
| **v.** | : | |
| | : | |
| **SANDRA STEVENS JACKSON,** | : | |
| | : | |
| **Defendant.** | : | |

### STATEMENT OF THE OFFENSE

1.      Had this case proceeded to trial, the government would have shown beyond a reasonable doubt, the following facts:

### INTRODUCTION

2.      At all relevant times, the defendant, Sandra Stevens Jackson ("Defendant"), maintained a home in Chicago, Illinois, and a home near the Dupont Circle and Georgetown neighborhoods of Washington, D.C.  From in or about May 2007 to in or about January 2013, Defendant served as Alderman of Chicago's Seventh Ward.  From at least in or about 2008 to the present, Defendant served as a consultant to Jesse L. Jackson, Jr.'s re-election campaigns. Starting in 2011, Defendant also started functioning as the campaign manager for the campaigns to re-elect Jesse L. Jackson, Jr.  From in or about January 2005 to in or about November 2006, Defendant served as treasurer of Jesse Jackson, Jr.'s re-election campaigns.

3.      At all relevant times, Jesse L. Jackson, Jr. ("Jesse Jackson, Jr.") served as a Congressman in the United States House of Representatives, representing Illinois's 2nd Congressional District.  Jesse Jackson, Jr., maintained a home in Chicago, Illinois, within the 2nd Congressional District, and a home near the Dupont Circle and Georgetown neighborhoods of Washington, D.C.  From in or about May 2007 to in or about January 2013, Defendant and Jesse

Jackson, Jr.—as a result of their duties as elected officials—spent substantial amounts of time apart, with Defendant spending much of the work week in Chicago and Jesse Jackson, Jr., spending much of the work week in Washington, D.C.

4.     At all relevant times, J. Donatella & Associates ("Donatella") was a consulting company that Defendant owned and operated.

5.     At all relevant times, Friends of Sandi Jackson ("Alderman Campaign") was the campaign committee that Defendant formed to support her campaigns to be elected Alderman of Chicago's Seventh Ward.  The Alderman Campaign maintained a bank account at a national bank.  Defendant possessed a debit card for the account.

6.     At all relevant times, The Seventh Ward Independent Political Organization ("SWIPO") was a political organization that provided constituent services for those in Chicago's Seventh Ward and that supported Defendant in her campaign efforts.  SWIPO was founded by Defendant and communications from the organization were sent under her name.  SWIPO maintained a bank account at a national bank.  Defendant possessed a debit card for the account.

7.     At all relevant times, Person A took part in preparing the forms Jesse Jackson, Jr.'s re-election campaigns filed with the Federal Election Commission ("FEC").  From in or about January 2005 through in or about November 2006, Person A was the assistant treasurer of Jesse Jackson, Jr.'s re-election campaigns and assisted Defendant in preparing the FEC filings. From in or about December 2006 through in or about June 2008, Person A officially served as the treasurer of Jesse Jackson, Jr.'s re-election campaigns.  After June 2008, Person A ceased serving as treasurer of Jesse Jackson, Jr.'s re-election campaigns, but continued to assemble FEC filings for the signature of the new treasurer.  From in or around June 2008 to the present,

Person A was also a staff member for Jesse Jackson, Jr., working in his Washington, D.C., Congressional Office.

8.      Person B served as the treasurer of Defendant's re-election campaigns from in or about July 2008 through in or about July 2012 and signed the forms prepared by Person A.

9.      At all relevant times, Person E was the owner of an Illinois-based consulting firm.

10.     Each candidate for federal office must form a principal campaign committee. Once designated, a principal campaign committee can establish and utilize bank accounts for the purpose of managing the finances of the campaign.  At all relevant times, Jesse Jackson, Jr.'s principal campaign committee was "Jesse Jackson Jr for Congress"[1] ("the Congressional Campaign").

CONDUCT

11.     From on or about July 24, 2006 through on or about October 15, 2012, Defendant failed to report approximately $600,000 in income she and Jesse Jackson, Jr., earned in 2005, 2006, 2007, 2008, 2009, 2010, and 2011 ("the Relevant Tax Years").  Defendant and Jesse Jackson, Jr., obtained the income in four ways: i) using the Congressional Campaign credit card to make purchases for personal expenses, knowing that Congressional Campaign funds would be used to pay the credit card bills for those purchases; ii) using funds from the Alderman Campaign account for personal expenses; iii) using funds from the SWIPO account for personal expenses; and iv) receiving funds through Donatella, but failing to report this income.

12.     Defendant provided her Washington, D.C., address as her home address in each of the income tax return forms filed in the Relevant Tax Years.  Defendant and Jesse Jackson, Jr.,

---

[1]      On or about January 14, 2010, a comma and a period were added to the name of the principal campaign committee: "Jesse Jackson, Jr. for Congress."  In all other respects, the name of the principal campaign committee remained the same.

signed, under penalty of perjury, the income tax returns or forms authorizing the filing of the income tax returns in each of the Relevant Tax Years.  Defendant signed each of the forms despite the fact that she then and there knew the reported income amounts were substantially less than the amount of income she and her husband received in each of the Relevant Tax Years.

### *Defendant's Expenditure of Congressional Funds for Personal Items*

#### *Congressional Campaign Credit Card*

13.     From at least August 2005 through April 2012, the Congressional Campaign maintained a credit card account entitled, "Jackson for Congress."  Individual credit card members on the account included Defendant and Jesse Jackson, Jr.

14.     For the period from in or about August 2005 through in or about April 2012, Defendant and Jesse Jackson, Jr., used the Congressional Campaign cards issued to them to purchase merchandise and services that were personal in nature.   These expenditures included high-end electronic items, collector's items, clothing, food and supplies for daily consumption, movie tickets, health club dues, personal travel, and personal dining expenses.  Examples of such charges on the Congressional Campaign credit cards include:

| Date | Description | Amount | Card Member |
|---|---|---|---|
| 9/15/2005 | Ford – Sales/Service/Repair | $2,200.44 | Defendant |
| 3/15/2007 | Walt Disney World – Transportation Services | $2,306.08 | Defendant |
| 11/20/2007 | Best Buy | $9,554.75 | Jesse Jackson, Jr. |
| 11/24/2007 | Best Buy | $1,102.81 | Jesse Jackson, Jr. |
| 11/30/2007 | Best Buy | $320.18 | Jesse Jackson, Jr. |
| 12/23/2007 | Build-a-Bear | $243.62 | Defendant |
| 6/10/2008 | Antiquities of Nevada | $3,200.00 | Jesse Jackson, Jr. |

| | | | |
|---|---|---|---|
| 7/19/2008 | All Children's Furniture | $1,438.00 | Jesse Jackson, Jr. |
| 7/24/2008 | Ticketmaster | $136.62 | Defendant |
| 7/28/2008 | All Children's Furniture | $8,149.64 | Jesse Jackson, Jr. |
| 8/2/2008 | ABT Electronics | $15,120.55 | Jesse Jackson, Jr. |
| 8/14/2008 | Antiquities of Nevada | $8,650.00 | Jesse Jackson, Jr. |
| 8/24/2008 | Mariel's Boutique | $3,544.00 | Defendant |
| 9/23/2008 | Antiquities of Nevada | $5,595.00 | Jesse Jackson, Jr. |
| 10/10/2008 | Ticketmaster | $299.00 | Defendant |
| 11/27/2008 | Martha's Vineyard Holistic Retreat | $5,687.75 | Jesse Jackson, Jr. |
| 12/3/2008 | Build-a-Bear | $70.27 | Jesse Jackson, Jr. |
| 12/23/2008 | Costco | $287.47 | Defendant |
| 2/12/2009 | Antiquities of Nevada | $5,150.00 | Jesse Jackson, Jr. |
| 3/17/2009 | Little Lamb Scholastic | $3,627.00 | Defendant |
| 7/1/2009 | Costco | $327.07 | Defendant |
| 11/04/2009 | Antiquities of Nevada | $3,900.00 | Jesse Jackson, Jr. |
| 11/14/2009 | Edward Lowell Furrier | $5,150.00 | Jesse Jackson, Jr. |
| 2/8/2010 | Antiquities of Nevada | $2,245.00 | Jesse Jackson, Jr. |
| 3/13/2010 | Antiquities of Nevada | $2,855.00 | Jesse Jackson, Jr. |
| 06/13/2010 | Costco | $693.78 | Defendant |
| 6/14/2010 | Costco | $600.00 | Defendant |

15.    Records from many of these merchants provide greater detail about the personal

nature of the goods and services purchased with these Congressional Campaign funds:

- Records from Best Buy reveal that Jesse Jackson, Jr., purchased multiple flat-screen televisions, multiple Blu-Ray DVD players, and numerous DVDs for the Washington, D.C., home;

- Records from Antiquities of Nevada reveal that Jesse Jackson, Jr., purchased

memorabilia related to Bruce Lee, Martin Luther King, Jr., Michael Jackson, Malcolm X, Jimmy Hendrix, and American Presidents, some of which was displayed in the Washington, D.C., home;

- Records from Mariel's Boutique reveal that Defendant purchased dresses, jewelry, shoes, and accessories;

- Records from All Children's Furniture reveal that Jesse Jackson, Jr., purchased children's bedroom furniture for the Washington, D.C., home;

- Records from ABT Electronics reveal that Defendant and Jesse Jackson, Jr., purchased, among other items, a washer, a dryer, a range, and a refrigerator for their Chicago home; while Jesse Jackson, Jr.'s card was used to complete these transactions, Defendant is listed on these records as the purchaser and the person to whom the items were to be shipped;

- Records from Build-a-Bear reflect that Defendant and Jesse Jackson, Jr., purchased stuffed animals and accessories for stuffed animals;

- Records from Costco reveal that Defendant purchased, among other items, video games, undergarments, cleaning supplies, toilet paper, toothpaste, soap, children's vitamins, and food;

- Records from Martha's Vineyard Holistic Retreat reveal that Jesse Jackson, Jr., purchased a five-day health retreat for a family member of Defendant; and

- Records from Edward Lowell Furrier reveal that Defendant purchased fur capes and parkas.

16.    The examples provided in the table above are but a fraction of the personal expenditures that Defendant and Jesse Jackson, Jr., made.  During the relevant period, Defendant and Jesse Jackson, Jr., collectively made approximately 3100 purchases that were personal in nature.  There are categories of expenditures into which a large number of these transactions can be placed.  The categories, and the amounts associated with these categories, are as follows:

- Personal expenditures at restaurants of approximately $60,857.04;

- Personal airfare expenditures of approximately $31,700.79;

- Personal expenditures at sports clubs and lounges of approximately $16,058.91 (including maintaining a family membership at a gym, purchasing food at the gym, and parking at the gym);

- Personal expenditures at tobacco shops of approximately $17,163.36;

- Personal expenditures for alcohol of approximately $5,814.43;

- Personal expenditures for dry cleaning of approximately $14,513.42;

- Personal expenditures at grocery stores of approximately $8,046.44; and

- Personal expenditures at drug stores of approximately $6,095.15.

17.     The approximately 3100 personal purchases made on the Congressional Campaign credit cards total approximately $582,772.58.  Congressional Campaign funds were used to pay all of the debt associated with the $582,772.58 in purchases.  A small portion of these purchases occurred in 2012.  Excluding the 2012 purchases, there are $581,614.53 in expenditures during the Relevant Tax Years.

18.     Of the $581,614.53 spent in the Relevant Tax Years, $171,707.29 was charged on the card issued to Defendant and $409,907.24 was charged on the card issued to Jesse Jackson, Jr.  Defendant either knew, or reasonably could have foreseen, that approximately $338,130.54 of these charges on Co-Conspirator's 1 card occurred because: i) records from vendors reveal that Defendant used the card issued to Jesse Jackson, Jr., to make some of these purchases;[2] ii) some of the items were purchased at locations where Defendant, not Jesse Jackson, Jr., typically made purchases;[3] iii) some of the purchases were made during joint outings or for joint expenses;[4] and iv) the remainder were similar in kind to the purchases that Defendant made or that Defendant observed Jesse Jackson, Jr., make.

19.     All of the remaining approximately $71,776.70 in personal expenditures on the Congressional Campaign credit cards issued to Jesse Jackson, Jr., were made without

---

[2]     These purchases total approximately $23,941.54.

[3]     These purchases total approximately $25,225.10.

[4]     These purchases total approximately $63,375.59.

Defendant's knowledge.  Moreover, all of these expenditures were of a different nature than the expenditures in which Defendant participated or the expenditures from which Defendant directly benefited.  These expenditures include:

- Expenditures at tobacco shops of approximately $17,163.36;

- Expenditures for alcohol of approximately $5,814.43;

- Dining and entertaining expenses of approximately $13,203.91; and

- Expenditures on memorabilia of approximately $35,595.00.

20.    Defendant and Jesse Jackson, Jr., failed to report on their income tax forms any of the personal expenditures that the Congressional Campaign made on their behalf.  As such, Defendant knowingly and willfully failed to report approximately $500,000 in taxable income earned through the misuse of the Congressional Campaign credit card during the Relevant Tax Years.

21.    During the Relevant Tax Years, Defendant solicited donors to contribute to the Congressional Campaign.  Defendant never disclosed to potential donors that she and Jesse Jackson, Jr., had already used funds contributed to the Congressional Campaign for their personal benefit, nor did she disclose that she and Jesse Jackson, Jr., intended to use new Congressional Campaign contributions for their personal benefit.

### Other Personal Uses of Congressional Funds

#### Payments to Defendant

22.    On or about March 17, 2006, Jesse Jackson, Jr., directed that a $36,000 check be issued to Donatella to pay billboard expenses for the Congressional Campaign.

23.    On or about March 24, 2006, Defendant deposited the $36,000 check into an account controlled by Donatella.

24.     On or about March 31, 2006, Defendant transferred the $36,000 from the Donatella account to a personal account that Defendant and Jesse Jackson, Jr., controlled.

25.     From on or about April 3, 2006, through on or about April 4, 2006, Defendant and Jesse Jackson, Jr., used nearly all of the $36,000 to pay down personal debts.

26.     Defendant and Jesse Jackson, Jr., failed to report on their 2006 income tax form any of the $36,000 that Donatella received from the Congressional Campaign.  As such, Defendant knowingly and willfully failed to report approximately $36,000 in taxable income earned by Donatella in 2006.

*Conduit Payments to Person A*

27.     From in or about March 2011 through in or about April 2011, Person A received two checks from the Congressional Campaign.  Person A had not performed work that would have entitled Person A to the amounts reflected in these two checks.  Instead, Jesse Jackson, Jr., instructed Person A to write checks in these amounts so that Person A could have sufficient funds to issue checks in the amounts that Jesse Jackson, Jr., desired so that Jesse Jackson, Jr., could purchase mounted elk heads from a taxidermist in Montana.   The details of those transactions are as follows:

| Congressional Campaign to Person A (Posted Date) | Amount of Check | Memo for Check | Person A to Taxidermist (Check Date) | Amount of Check |
|---|---|---|---|---|
| 3/29/2011 | $3,500 | "for Data Reconciliation" | 4/1/2011 | $3,000 |
| 4/21/2011 | $1,500 | "for Data Entry & Cleanup" | 4/21/2011 | $1,053 |

28.     Defendant learned in summer 2012 that Congressional Campaign funds were used to purchase these elk heads.

29.     Defendant and Jesse Jackson, Jr., failed to report on their 2011 income tax form, which was filed in October 2012, any of the $4,053 that Person A received from the Congressional Campaign.  As such, Defendant knowingly and willfully failed to report approximately $4,053 in taxable income they jointly earned in 2011.

30.     On or about August 23, 2012, an undercover employee with the FBI ("UCE 1") called Person A, informing Person A that UCE 1 was an interior designer who had received Person A's name from the taxidermist and inquiring whether Person A had elk heads for sale.

31.     From on or about August 24, 2012, through on or about August 30, 2012, Person A completed the sale of Jesse Jackson, Jr.'s elk heads to UCE 1.  UCE 1 represented that UCE 1's client was willing to pay $5,300, which was less than the original price.  Person A agreed to the price and instructed UCE 1 to wire the funds for the elk heads to one of Jesse Jackson, Jr.'s personal accounts.  UCE 1 wired the funds as instructed.  After wiring the funds, UCE 1 arranged to pick up the elk heads in Chicago, where they had been moved in early August 2012.

32.     Defendant, knowing that these elk heads had been purchased with Congressional Campaign funds, directed: that the elk heads be moved from Washington, D.C., to Chicago, Illinois; that Person A sell the elk heads; that Person A sell them for less than the amount for which they were purchased; and that Person A instruct UCE 1 to wire the proceeds to Jesse Jackson, Jr.'s personal account.

*Paying Personal Credit Card Expenditures*

33.     From in or about September 2007 through in or about June 2011, Jesse Jackson, Jr., used $14,442.83 in Congressional Campaign funds to pay down balances on personal credit cards maintained by Defendant or Jesse Jackson, Jr.  The balances on these cards reflected expenditures made for personal, not Congressional Campaign, purposes.   These payments occurred on the following dates in the following amounts:

- September 13, 2007: $2,000.00

- September 14, 2007: $2,457.16

- October 12, 2007: $4,355.49

- October 9, 2009: $1,640.25

- December 24, 2009: $1,271.16

- July 7, 2011: $2,718.77

34.     Defendant and Jesse Jackson, Jr., failed to report on their income tax forms any of these payments that the Congressional Campaign made on their behalf.  As such, Defendant knowingly and willfully failed to report approximately $14,442.83 in taxable income earned through these payments in tax years 2007, 2009, and 2011.

***Defendant's Expenditure of Alderman Funds for Personal Items***

35.     Defendant spent approximately $22,421.22 of Alderman Campaign Funds on personal expenditures.  Examples of these expenditures include:

| Date | Description | Amount |
|------|-------------|--------|
| 11/5/2007 | The Bedding Experts | $5,280.81 |
| 2/19/2008 | Caesars Spa | $1,060.00 |
| 2/21/2008 | Venetian | $771.86 |
| 4/14/2008 | Comfort One Shoes | $1,422.34 |

36.     During the relevant period, Defendant solicited donors to contribute to the Alderman Campaign.  Defendant never disclosed to potential donors that she had already used funds contributed to the Alderman Campaign for her personal benefit, nor did she disclose that she intended to use new Alderman Campaign contributions for her personal benefit.

37.     Defendant failed to report on her income tax forms any of the personal expenditures that the Alderman Campaign made on her behalf.  As such, Defendant knowingly and willfully failed to report approximately $22,421.22 in taxable income earned through the misuse of Alderman Campaign funds during the Relevant Tax Years.

### Defendant's Expenditure of SWIPO Funds for Personal Items

38.     Defendant spent approximately $209.43 of SWIPO Funds on personal expenditures.

39.     Defendant failed to report on her income tax forms any of the personal expenditures that SWIPO made on her and Jesse Jackson, Jr.'s behalf.  As such, Defendant knowingly and willfully failed to report approximately $209.43 in taxable income earned through the misuse of Alderman Campaign funds during the Relevant Tax Years.

### Defendant's Receipt of Unreported Funds Through Donatella

40.     During the Relevant Tax Years, Defendant reported the income she earned from Donatella on Schedule C of the annual income tax returns of Defendant and Jesse Jackson, Jr.

41.     In 2009, Defendant deposited $80,000 in an account controlled by Donatella that she failed to include on her and Jesse Jackson, Jr.'s joint tax return.  The deposits occurred as follows:

- On or about January 1, 2009, Defendant received $15,000 from the Congressional Campaign in legal fees.  Defendant deposited these funds in a Donatella account;

- On or about January 6, 2009, Defendant received $40,000 from Person E.  The memo line for the check reads "consulting."  Defendant deposited these funds in a Donatella account; and

- On or about July 29, 2009, Defendant received $25,000 from Person E.  Defendant deposited these funds in a Donatella account.

42.     Defendant and Jesse Jackson, Jr., failed to report on their income tax forms any of these payments that Donatella received. Defendant has represented that the funds from Person E were a gift to her.  The government has evidence that the $65,000 was not a gift.

43.     Defendant knowingly and willfully failed to report, at least, $15,000 in taxable income earned through Donatella.

***Other Conduct***

44.     From in or about August 2005 through in or about July 2012, Defendant and Jesse Jackson, Jr., directed that materially false and misleading reports be filed with the FEC. Defendant and Jesse Jackson, Jr., on numerous occasions, directed Person A not to itemize the personal expenditures made on the Congressional Campaign credit cards, which resulted in the failure to report personal expenditures on the Congressional Campaign credit cards that should have been reported.   On other occasions, Defendant and Jesse Jackson, Jr., knowingly and intentionally provided Person A with false and misleading justifications for their expenditures from Congressional Campaign funds, causing Person A, in turn, to prepare false and misleading reports for submission to the FEC.  Defendant, Person A, and Person B then submitted the forms

containing the materially false and misleading statements to the FEC.   Examples of some of these false and misleading disclosures include:

- On or about May 29, 2008, Person A reported that the Congressional Campaign spent $1,553.08 on January 22, 2008, at a Chicago Museum for "room rental – fundraiser." In truth and in fact, Jesse Jackson, Jr., spent these funds to purchase porcelain collector's items.

- On or about July 11, 2008, Person A reported that the Congressional Campaign spent $387.53 on May 27, 2008, at Home Depot for "Equp for Office Repairs."   In truth and in fact, Jesse Jackson, Jr., spent these funds to purchase grass seed and fertilizer for the lawn at his Chicago home.

- On or about January 23, 2009, Person B reported that the Congressional Campaign spent $224.89 on November 4, 2008, at a hotel restaurant for "FR Dinner Mtg."   In truth and in fact, Jesse Jackson, Jr., spent these funds to purchase lunch for him and his family.

- On or about January 23, 2009, Person B reported that the Congressional Campaign spent $387.04 on November 22, 2008, at Costco for "Food for Campaign Staff Holiday dinner."   In truth and in fact, Defendant spent these funds to purchase bath robes, a Christmas train, cleaning supplies, and food for Defendant's family's personal use.

## CONCLUSION

45.     During the relevant period, Defendant knowingly and willfully failed to report approximately $601,964.31 in taxable income.  This income was earned during the Relevant Tax Years as follows:

| Tax Year | Total Income | Amount of Unreported Income | Tax Loss |
|----------|--------------|------------------------------|----------|
| 2005 | $187,455 | $34,277.31 | $9,597.65 |
| 2006 | $220,783 | $158,092.56 | $44,265.92 |
| 2007 | $281,825 | $161,309.27 | $45,166.60 |
| 2008 | $247,919 | $114,378.64 | $32,026.02 |
| 2009 | $256,746 | $70,493.79 | $19,738.26 |
| 2010 | $266,089 | $29,942.87 | $8,384.00 |
| 2011 | $271,969 | $33,469.87 | $9,371.56 |
| **Totals:** | -- | $601,964.31 | $168,550.01 |

MATT GRAVES
MICHAEL ATKINSON
Bar No. DC - 481052 (Graves)
Bar No. DC - 430517 (Atkinson)
Assistant United States Attorneys
555 4th Street, N.W., 5th Floor
Washington, D.C.  20530

**Defendant's Acceptance**

I have read this Statement of the Offense and carefully reviewed every part of it with my attorneys. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

_2/20/13_____          _Sandra Jackson_____
Date                                Sandra Stevens Jackson


**Defense Counsel's Acknowledgment**

I am Sandra Stevens Jackson's attorney. I have reviewed every part of this Statement of the Offense with her. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

_2/20/13_____          _____
Date                                Thomas L. Kirsch II, Esq.


_2/20/13_____          _____
Date                                Dan K. Webb, Esq.


16